UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BOZEMAN DEACONESS HOSPITAL | ) | |
| 915 Highland Boulevard | ) | |
| Bozeman, MT  59715 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHARLESTON AREA MEDICAL | ) | |
| CENTER | ) | Civil Action No. _____ |
| 501 Morris St. | ) | |
| Charleston, WV  25325 | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KATHLEEN SEBELIUS, Secretary, U.S. | ) | |
| DEPARTMENT OF HEALTH and | ) | |
| HUMAN SERVICES | ) | |
| 200 Independence Avenue, SW | ) | |
| Washington, DC  20201 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## **COMPLAINT**

### I.   SUMMARY

1.     Plaintiffs are two non-profit organizations that own and operate acute care

hospitals (the "Hospitals") participating in the Medicare program.  The Hospitals bring this

complaint for judicial review of the final administrative decisions of the Provider

Reimbursement Review Board (the "Board").  The Board dismissed the Hospitals' request

to recognize good cause for an extension of time for filing appeals with the Board.

1

2.      The governing statute, 42 U.S.C. §1395oo(a)(3), sets a 180-day limit from the initial determination, here the notices of provider reimbursement ("NPRs"), for providers to file an administrative appeal of the amount of reimbursement they are due for inpatient services provided to Medicare beneficiaries.

3.      By regulation promulgated in 1974, the Secretary (the "Secretary") of the United States Department of Health and Human Services ("HHS") authorized the Board to extend the 180-day limitation, for good cause, up to three years.  39 Fed. Reg. 34517 (1974) (codified at 42 C.F.R. § 405.1841(b) (2007)) (the "Original Good Cause Regulation").

4.      In 2008, the Secretary replaced the Original Good Cause Regulation with a new regulation which states the Board may extend the 180-day time limit for "good cause" "only if the provider demonstrates in writing it could not reasonably be expected to file timely due to extraordinary circumstances beyond its control (such as a natural or other catastrophe, fire, or strike), and the provider's written request for an extension is received by the Board within a reasonable time (as determined by the Board under the circumstances) after the expiration of the applicable 180-day limit . . . ."  73 Fed. Reg. 30250 (2008) (codified at 42 C.F.R. § 405.1836(b) (2012)) (the "Post-2008 Good Cause Regulation").  The Post-2008 Good Cause Regulation retains the three-year cutoff for all claims and imposes several new additional requirements.

5.      The Supreme Court recently provided important guidance on HHS's Original Good Cause Regulation in *Sebelius v. Auburn Regional Medical Center*.  133 S. Ct. 817 (2013) ("*Auburn Regional*").  In *Auburn Regional*, Justice Sotomayor wrote a concurring opinion, which addressed, in part, the proper parameters for the good cause

2

extension regulation, and casts severe doubt on the validity of the restricted definition of

"good cause" set forth in the Post-2008 Good Cause Regulation.  On this point, Justice

Sotomayor wrote:

> . . . I am satisfied that the Secretary's 3-year good-cause exception is a
> reasonable accommodation of the competing interests in administrative
> efficiency and fairness. We would face a different case if the Secretary's
> regulation did not recognize an exception for good cause or defined good
> cause so narrowly as to exclude cases of fraudulent concealment and
> equitable estoppel. *See ante*, at 3, n. 2 (explaining that the Secretary's
> amended regulation limiting the scope of "'good cause,'" 73 Fed.
> Reg.30250 (2008) (codified in 42 CFR §405.1836(b) (2012)), is not before
> us).

*Id.* at 830.

6.      The Hospitals appealed to the Board more than 180 days after the receipt of

their NPRs but requested that the Board recognize good cause for an extension of time for

filing appeals.

7.      With respect to their substantive claims, both Hospitals have sought to

appeal underpayments caused by the Secretary's systematic errors in calculating the

statutorily mandated rural floor budget neutrality adjustment factor ("RFBN Adjustment"),

applicable to the Hospitals' fiscal years at issue.  The RFBN Adjustment was recently the

subject of a case decided by the United States D.C. Circuit Court of Appeals, *Cape Cod

Hosp. v. Sebelius*, 630 F.3d 203, 213 (D.C. Cir. 2011) and a settlement by the Secretary

with more than 2000 hospitals in 2012, as discussed below.  The Hospitals each requested

the Board to recognize good cause for an extension of the 180 days to appeal their

underpayments resulting from the erroneous RFBN Adjustment applicable to Plaintiff

Charleston Area Medical Center ("CAMC")'s fiscal year ending ("FYE") in 2006 and

Plaintiff Bozeman Deaconess Hospital ("Bozeman")'s FYE 2009.  As "good cause" for

their delay, the Hospitals presented the facts that the Secretary, in the first instance, had

3

failed to disclose its systematic errors and, then, until her settlements in 2012, had taken the public position that the agency would not correct any past errors due to the prospective nature of the inpatient payment system, all as further described below.  Because of the Secretary's nondisclosure, and relying on her public statements, the Hospitals were unaware of the relevant facts and circumstances supporting their RFBN Adjustment appeals during their respective 180-day appeal windows.

8.      In addition, Plaintiff CAMC filed a request for good cause extension to excuse its late filing of an appeal, also with respect to its FYE 2006, related to the amount of supplemental Medicare outlier payments that it was entitled to receive under the Social Security Act, §§ 1886(d)(5)(A)(i)-(iv) and (d)(3)(B); *see also*, 42 U.S.C. §§ 1395ww(d)(5)(A)(i)-(iv) and (d)(3)(B) (the "Outlier Payment Statute").  CAMC supported this second request for a good cause extension with two documents which it discovered only after the 180-day appeal period had expired.  These documents revealed that HHS had deliberately concealed key information relevant to its regulations implementing the Outlier Payment Statute.  Further, HHS made misleading statements in its rulemakings relating to alternatives and information that it considered as grounds for its regulations.  CAMC was misled by HHS's statements and omissions, until the key information was discovered by way of the documents, after the 180-day deadline had run.  Thus, CAMC had good cause to support an extension.

9.      The Board, applying the Post-2008 Good Cause Extension Regulation, denied the Hospitals' respective requests to recognize good cause for extension of time for filing appeals relating to the RFBN Adjustment.  The Board did not analyze HHS's concealment of the key information relating to the RFBN Adjustment claims.  Instead, the

4

Board summarily stated that HHS's "errors [in calculating the RFBN Adjustment] were known as early as when the district court issued its opinion in the *Cape Cod Hosp. v. Sebelius*," on December 22, 2009, before the Hospitals received their respective NPRs. The Board erroneously imputed whatever information might have been set forth in the district court *Cape Cod* case to the Hospitals, without any analysis and without considering the fact that the district court ruled for the Secretary and the D.C. Circuit did not issue its decision in *Cape Cod* until January 14, 2011.

10.     The Board did not even address CAMC's separate request to recognize good cause for an extension of time for filing an appeal related to its claims under the Outliers Payment Statute.  Nevertheless, the Board completely dismissed both Hospitals' respective appeals.

11.     The Hospitals contend that the Board erred in finding that good cause did not exist.  The Board applied an unduly narrow standard under the Post-2008 Good Cause Regulation, which does not pass muster under the guidance issued by the Supreme Court in *Auburn Regional*.  The Board also did not consider HHS's intentional concealment of the key information, and did not even address CAMC's related request for good cause extension to file its claims under the Outlier Payment Statute.

12.     Therefore, the Hospitals respectfully request that this Court vacate the decisions of the Board, find that "good cause" exists to excuse the Hospitals' failure to file

4840-9326-4662

within the applicable 180-day appeal deadline, and remand these appeals to the Board to proceed on their merits.[1]

## II.   PARTIES

13.    The Hospitals are non-profit organizations that, directly or through wholly owned subsidiaries, own and operate the acute care hospitals identified in the subparagraphs below.  Each of the Hospitals has been certified to and has participated in the Medicare program as a "provider of services" during the time relevant to this Complaint, including, with respect to each of the Hospitals, during each of the fiscal years identified below.

> a.  Plaintiff Bozeman is a non-profit organization located in Bozeman, Montana.  Bozeman is appealing its payment by the Secretary for its fiscal year ending December 31, 2009.
>
> b.  Plaintiff CAMC is a non-profit organization located in Charleston, West Virginia.  CAMC is appealing its payment by the Secretary for its fiscal year ending December 31, 2006.

14.    Defendant Kathleen Sebelius is the Secretary of HHS and is sued in her official capacity.

## III.   JURISDICTION AND VENUE

15.    This Court has jurisdiction under:  42 U.S.C. § 1395oo(f), which provides jurisdiction for appeals of Medicare payment decisions; and 5 U.S.C. § 706, which

---

[1] Because the Outlier and RFBN issues raised by the Hospitals in their appeals concern challenges to the validity of the Secretary's regulations, the appeals would be appropriate for expedited judicial review ("EJR"), under 42 U.S.C. § 1395oo(f).

4840-9326-4662

provides jurisdiction for appeals of final agency action under the Administrative Procedure Act ("APA").

16.     Each of the Hospitals' individual appeals meet the jurisdictional minimum amount in controversy of $10,000 under 42 U.S.C. § 1395oo.

17.     Venue is proper in this Court under 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1391(c).

18.     The Board's decisions to deny the good cause extension requests and dismiss the Hospitals' appeals comprise the Secretary's final decisions and are subject to judicial review.  42 U.S.C. § 1395oo(f).

19.     This action is timely filed under 42 U.S.C. § 1395oo(f), in that it has been brought within 60 days of the Hospitals' respective receipt of the Secretary's final decisions on their administrative appeals.

IV.    **STATUTORY, REGULATORY, AND FACTUAL BACKGROUND UNDERLYING THE GOOD CAUSE EXTENSION**

A.     **Providers' Statutory Right to a Board Hearing Regarding the Adverse Medicare Reimbursement Decisions of Their Fiscal Intermediaries**

20.     The Medicare program, established as title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (referred to throughout the rest of this Complaint as the "Medicare Act"), is the federal entitlement program that provides health care insurance to the nation's aged and disabled.  Originally, Medicare reimbursed hospitals based on the "reasonable costs" they incurred in providing services to Medicare patients.  Concerned that this system created inadequate incentives for hospitals to control costs, Congress in 1983 required the Secretary to implement a prospective payment system ("PPS") under which hospitals would receive a fixed payment for inpatient services.

7

21.     The Secretary administers the Medicare program.  CMS is a component of HHS.  CMS is responsible for the daily operation and administration of the Medicare program.

22.     CMS makes payments to providers through its fiscal intermediaries ("FIs").[2]   FIs are private insurance companies that process Medicare claims as the Secretary's agents.

23.     In connection with receiving reimbursement from the Secretary for providing covered services to Medicare beneficiaries, each provider submits a cost report at the end of its fiscal year to its FI.

24.     The FI audits the cost report and issues a Notice of Program Reimbursement ("NPR") specifying the amount of reimbursement due to the provider and explaining any adjustments.

25.     In 1972, Congress enacted provisions governing provider rights to a hearing, which are codified at 42 U.S.C. § 1395oo.  § 1395oo(a)(3) requires the provider to file a request for hearing within 180 days of receiving the NPR.

26.     The Secretary, acting through the CMS Administrator, may review a Board decision either on her own motion or at a provider's request.  Any provider that remains dissatisfied with a final decision of the Board or the Secretary may seek review in the United States District Courts.  42 U.S.C. §§1395oo(a), (d), and (f).

---

[2] In 2005, FIs were replaced by Medicare administrative contractors ("MACs").  *See* 42 U.S.C. § 1395h; 42 C.F.R. § 413.24(f).  The Complaint will refer to FIs and MACs interchangeably as FIs.

**B.**      **Since 1974, the Secretary has Extended the 180-Day Limitation, for
Good Cause, Up to Three Years**

27.      By regulation promulgated in 1974, the Secretary of HHS authorized the

Board to extend the 180-day limitation, for good cause, up to three years.  39 Fed. Reg.

34517 (1974) (codified in 42 C.F.R. §405.1841(b) (2007)).

28.      The Original Good Cause Regulation, as promulgated in 1974, only
imposed a three year limitation to the Board's ability to excuse late filings for good cause
shown:

> Extension of time limit for good cause.  A request for a Board hearing
> filed after the time limit prescribed in paragraph (a) of this section shall
> be dismissed by the Board, except that for good cause shown, the time
> limit may be extended.  However, no such extension shall be granted
> by the Board if such request is filed more than 3 years after the date the
> notice of the intermediary's determination is mailed to the provider.

29.      Because CAMC treated patients in FYE 2006, its right to appeal these

claims accrued before the 2008 amendments to the PRRB Regulations.  Thus, the Original

Good Cause regulation applies to CAMC's motions for good cause with respect to its NPR

for FYE 2006.

**C.**      **In 2008, the Secretary Amended the Good Cause Extension Regulation
to Impose Additional Requirements**

30.      In 2008, after notice and comment, the Secretary amended the Good Cause

Extension Regulation to impose additional requirements and limitations.  73 Fed. Reg.

30190 (2008) (codified in 42 C.F.R. §405.1836 (2012)).

31.      The Post-2008 Good Cause Extension Regulation states, in part, that the

Board may extend the 180-day time limit for "good cause" "only if the provider

demonstrates in writing it could not reasonably be expected to file timely due to

extraordinary circumstances beyond its control (such as a natural or other catastrophe, fire,

or strike), and the provider's written request for an extension is received by the Board

9

within a reasonable time (as determined by the Board under the circumstances) after the

expiration of the applicable 180-day limit . . . ."  42 C.F.R. §405.1836(b).

32.     The Post-2008 Good Cause Extension Regulation further prohibits the

Board from granting a good-cause extension request based on "a change in the law,

regulations, CMS Rulings, or general CMS instructions (whether based on a court decision

or otherwise) or a CMS administrative ruling or policy . . . ."  42 C.F.R. §405.1836(c)(1).

33.     Finally, the Post-2008 Good Cause Extension Regulation states that "A

finding by the Board or the Administrator that the provider did not demonstrate good cause

for extending the time for requesting a Board hearing is not subject to judicial review."  42

C.F.R. §405.1836(e)(4).

**D.      The Supreme Court Recently Reviewed the Original Good Cause
Regulation and Provided Guidance as to Standards Governing
Grounds for Good Cause**

34.     The Supreme Court recently analyzed the validity of the Original 2008

Good Cause Regulation, and held that "the Secretary lawfully exercised her rulemaking

authority in providing for a three-year 'good cause' extension."  *Auburn Regional* at 828.

35.     In a concurring opinion, Justice Sotomayor offered instructive guidance on

what made the Original Good Cause Regulation pass muster and, in so doing, the required

standards for "good cause."  Discussing the majority opinion, Justice Sotomayor stated:

> . . . I am satisfied that the Secretary's 3-year good-cause exception is a
> reasonable accommodation of the competing interests in administrative
> efficiency and fairness. **We would face a different case if the
> Secretary's regulation did not recognize an exception for good
> cause or defined good cause so narrowly as to exclude cases of
> fraudulent concealment and equitable estoppel**. See ante, at 3, n. 2
> (explaining that the Secretary's amended regulation limiting the scope
> of "'good cause,'" 73 Fed. Reg.30250 (2008) (codified in 42 CFR
> §405.1836(b) (2012)), is not before us).

*Id* at 830 (emphasis added).

36.     Thus, the Post-2008 Good Cause Regulation should be construed consistently with Justice Sotomayor's direction that "good cause" may not be defined so narrowly as to exclude cases of fraudulent concealment and equitable estoppel.

## V.     FACTS SPECIFIC TO THE HOSPITALS' APPEALS

### A.     Overview of the Hospitals' Substantive Claims

37.     Given the basis (or a lack of any basis) offered for the Board's decisions on the good cause extension requests, the merits of the Hospitals' appeals are not yet at issue and the Hospitals do not here plead their substantive claims. *See, e.g., Tucson Med. Ctr. v. Heckler*, 611 F. Supp. 823, 825 (D.D.C. 1985). Nevertheless, the Hospitals' substantive claims warrant brief discussion.

#### 1.     The RFBN Adjustment Claim

38.     Both Hospitals are challenging the RFBN Adjustment issue, in their respective FYEs, that caused underpayments by HHS for treatment and care that the Hospitals provided to patients under the Medicare inpatient prospective payment system ("IPPS"). Medicare payments under IPPS are calculated using a number of factors including a "standardized amount," which is the base payment rate established by the Secretary. The standardized amount is adjusted upward or downward by a hospital's "wage index" to reflect average hospital wage levels in the hospital's geographic region.

39.     In 1997, Congress corrected an anomaly with the applicable Medicare wage indices. Certain urban hospitals were being paid under wage indices that were lower than those of the average rural hospital in their state. In the Balanced Budget Act of 1997 ("BBA"), Congress mandated that the wage index for rural hospitals in a state would be the

"floor" for the wage index for urban hospitals in the same state – *i.e.* all urban hospitals would be assigned wage indices at least as great as the wage index assigned to rural hospitals within the same state.  This statutory requirement is known as the "Rural Floor." BBA, § 4410(a), Pub. L. No. 105-33, 42 U.S.C. § 1395ww note (the "Rural Floor Statute"). Congress also mandated that the Rural Floor be implemented so as to have a budget neutral effect on Medicare payments to all hospitals, and directed the Secretary to adjust the wage index "in a manner which assures that the aggregate payments made ... are not greater or less than those which would have been made" if the rural floor did not apply (the "RFBN Adjustment").

        40.     The D.C. Circuit held that the Secretary made what amounts to a "cumulative error" in making the RFBN Adjustment.  *See Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 213 (D.C. Cir. 2011) ("Having built the past into the cumulative methodology it chose for counteracting the budgetary impact of the rural floor, CMS may not now ignore past errors that have the effect of overly deflating current aggregate payments in violation of BBA section 4410(b)'s budget-neutrality mandate").  *Cape Cod* is the law of this Circuit.  However, the Secretary's position was that the agency would not make any retroactive corrections to the RFBN.  *See* 72 Fed. Reg. 47130, 47330 ("With regard to alleged errors in FYs 1999 through 2007, our calculation of budget neutrality in past fiscal years is not within the scope of this rulemaking. Even if errors were made in prior fiscal years, we would not make an adjustment to make up for those errors when setting rates for FY 2008. It is our longstanding policy that finality is critical to a prospective payment system. Although errors in rate setting are inevitable, we believe the need to establish final prospective rates outweighs the greater accuracy we might gain if we retroactively

recomputed rates whenever an error is discovered."). But almost a year later, the Secretary reversed course and agreed to pay out more than $3 billion to approximately two thousand hospitals in settlement of claims based on her errors in the RFBN Adjustment. These settlement payments included FFYs reaching as far back as FFY 1999.

41.     In their appeals, and based on this Circuit's *Cape Cod* decision, the Hospitals contend that the Secretary improperly calculated the RFBN Adjustment and, as a result, underpaid them by using erroneous rates and amounts of IPPS payments due for services provided under the Medicare program for their respective FYEs 2006 and 2009. The Secretary's applicable regulations implementing the RFBN Adjustment are contrary to the Rural Floor Statute and are otherwise in violation of the APA for multiple reasons. The *Cape Cod* decision has already established the Secretary's errors, and she has admitted the same in the Federal Register.

### 2.     The Outlier Case Payments Claim

42.     CAMC also asserted that it was not paid the full amount and number of supplemental Medicare outlier payments that it was entitled to receive under the Outlier Payment Statute.

43.     Congress has mandated that hospitals participating in the Medicare program shall receive additional payments for treating extraordinarily expensive cases, known as "outlier" cases ("Outlier Case Payments"), under the Outlier Payment Statute. These additional Outlier Case Payments are intended both to protect hospitals from large financial losses due to unusually expensive cases and to eliminate any disincentive that hospitals might otherwise have to providing critical care to particularly needy, and costly, patients. The Outlier Statute directs, among other things, that Outlier Case Payments "approximate the marginal cost of care" that is in excess of a threshold established

annually by the Secretary.  The Secretary claims to set the annual threshold at a level such

that total projected Outlier Case Payments will equal 5.1% of the total projected inpatient

hospital payments for the upcoming Federal Fiscal Year ("FFY").

44.     However, the Secretary's regulations implementing the Outlier Statute have

consistently been contrary both to the intent of Congress and to the agency's obligations

under the APA.  Specifically as related to CAMC's FYE 2006 Outlier Case Payments,

HHS's errors include, among others: adopting regulations that have necessarily resulted in

the agency setting inappropriately high fixed-loss thresholds (HHS's cost hurdle qualifying

patient cases for outlier payments); yielding Outlier Case Payments that were both

inappropriately low and few in number; knowingly relying on faulty data; failing to

address one or more important aspects of the problems that are causing the underpayments;

relying on unsound methodologies which, without reasonable justification, are contrary to

alternatives suggested by commenters; and failing to disclose its actual consideration of,

and reasons in rejecting, reasonable alternative methodologies and data.  As a result,

CAMC has not received the full amount of Outlier Case Payments as intended by

Congress.

45.     Should the Hospitals prevail in their appeal of the Board's decisions,

remand to the Board would ordinarily be the appropriate remedy to allow the Hospitals to

file requests for EJR to exhaust their administrative remedies.

**B.      The Hospitals Pursued Administrative Hearing Appeals Before The Provider Reimbursement Review Board.**

46.     With respect to each of the FYEs identified in paragraph 13 of this

Complaint, each of the Hospitals timely filed their respective cost reports in accordance

with the Secretary's applicable rules and regulations.

4840-9326-4662

47.     Each of the Hospitals appealed to the PRRB more than 180 days after the receipt of their respective NPRs, but requested the Board to recognize good cause for an extension of this 180-day deadline for filing appeals.

### 1.     CAMC's Two Good Cause Extension Requests

48.     CAMC's FYE 2006 NPR is dated February 24, 2010.  CAMC filed two motions for good cause extensions.

49.     On August 14, 2012, CAMC filed its first motion for good cause extension to raise the challenge that it was not paid the full amount of the supplemental Medicare Outlier Case Payments to which it is entitled under the Outlier Payment Statute.

50.     The good cause justifying the delay in filing the Outliers Case Payment claim is that HHS both knowingly withheld key information, and made misleading statements, regarding its FLT rulemakings relevant to CAMC's FYE 2006 claims for Outlier Case Payments.

51.     That HHS's regulations were the product of knowingly withheld information and misleading statements came to light only when CAMC learned of two documents.  The first document is HHS's Executive Order 12866 Submission of an "Interim Final Rule" (the "IFR") to the Office of Management and Budget, relating to a 2003 rulemaking amending the Outlier Payment Regulations and considering whether to lower the FLT that year.  The second document is a report by the HHS OIG, dated June 28, 2012, summarizing HHS OIG's review of a reconciliation process set forth in the agency's amended regulations for calculating Outlier Case Payments (the "OIG Report").

52.     The IFR and the OIG Report each demonstrate that HHS did not use the best available data, ignored without explanation reasonable and feasible methodological alternatives, failed to consider one or more important aspects of the problem, and failed to

administer the Outlier program in a manner consistent with Congressional intent. The result of HHS's invalid rulemakings was inflated FLTs which, predictably, resulted in significant underpayment of Outlier Case Payments to CAMC and other hospitals.

53.     CAMC could not reasonably have been expected to know that grounds, revealed by the IFR and the OIG Report, existed to challenge the Secretary's Outlier regulations. CAMC did not learn of the IFR until February 12, 2012, and the OIG Report was not published until June 28, 2012, and thus was not aware of the key information presented by those documents during the 180 days following receipt of its NPR. The Secretary's deliberate concealment of this key information set forth in the IFR and the OIG Report prevented CAMC from timely appealing within the 180-day appeal period. These extraordinary circumstances justify a good cause extension for requesting a Board hearing. Moreover, CAMC filed its motion for good cause extension within a reasonable period of time (within 180 days) after learning of the IFR and the OIG Report.

54.     On September 28, 2012, CAMC filed its second motion for good cause extension to challenge underpayments due to the RFBN Adjustment issue for its FYE 2006.

55.     The good cause justifying the delayed RFBN Adjustment filing is that HHS chose not to disclose its systematic errors in calculating the RFBN Adjustment, and the full scope of those errors did not come to light until the D.C. Circuit's decision in *Cape Cod*, in January 2011, long after the 180-day appeal period had expired since CAMC received its NPR in February of 2010. Moreover, even after the D.C. Circuit's *Cape Cod* decision, and not until the Settlement Agreement, HHS never changed its public position that it would not provide any retroactive relief (for FYEs 2011 and earlier). 72 Fed. Reg. at 47330.

16

56.     In April of 2012, however, HHS reversed its position that it would not provide retroactive relief by announcing that it had agreed to a multibillion dollar settlement, with a group of approximately 2,000 providers, to correct underpayments in their IPPS reimbursements for the FFYs 1998 through and including 2011 (the "Settlement Agreement").  This was the first notice to the Hospital Providers that HHS would correct its past mistakes and provide retroactive relief.

57.     HHS's longstanding misleading statements and omissions relating to the RFBN Adjustment deprived the Hospitals of timely information that was central to filing the RFBN Adjustment claim.  Without such information, CAMC was unaware of these grounds for appeal within 180 days of its NPR.

58.     CAMC moved for a good cause extension within 3 years of its NPR and within a reasonable time after first learning of key information that previously had been withheld relating to the RFBN Adjustment issue.  Thus, there is good cause for an extension.

### 2.     Bozeman's Good Cause Extension Request

59.     Bozeman's FYE 2009 NPR is dated June 20, 2011.  Bozeman filed a motion for good cause extensions on September 28, 2012.

60.     For the same reasons described in paragraphs 55-57, Bozeman requested a good cause extension to challenge the validity of the Secretary's regulations implementing the Rural Floor Statute and the resulting underpayments therefrom with respect to its FYE 2009.  Just as CAMC did, Bozeman presented good cause for an extension of the 180-day filing deadline, filed with the Board within 180 days of learning that HHS had finalized the Settlement Agreement.

4840-9326-4662

61.     Furthermore, HHS amended regulations relating to Board appeals in 2008 to impose the "self-disallowance" requirement that a provider, to be entitled to exercise its statutory right of appeal, must first have "preserv[ed] its right to claim dissatisfaction with the amount of Medicare payments for the specific item(s) at issue, by . . . self-disallowing the specific item(s) by following the applicable procedures for filing a cost report under protest, where the provider seeks payment that it believes may not be allowable or may not be in accordance with Medicare policy (for example, if the intermediary lacks the discretion to award the reimbursement the provider seeks for item(s))." See, 42 C.F.R. §405.1835(a) (2008).

62.     Bozeman timely filed its cost report for FYE 2009 within five months of the close of its fiscal year. This was before information relating to HHS's cumulative errors in calculating RFBN Adjustments were revealed.  Bozeman could not have reasonably been expected to self-disallow the RFBN Adjustment issue on its FYE 2009 cost report, thus precluding a timely appeal on that issue under the agency's regulations.

### 3.     The Board's Dismissal of the Good Cause Extension Requests Were Based on Misstatements of Facts and/or An Overly Narrow Interpretation of the Law

63.     The Board issued two dismissals, both dated July 31, 2013, and received on August 5, 2013, for the good cause extension requests at issue.

64.     The Board's dismissal with respect to CAMC did not even address its first request for good cause extension to raise its appeal relating to HHS's underpayment of Outlier Case Payments.  Even though the Board acknowledged this first motion for good cause extension and assigned to it Case No. 12-0521, the Board did not mention CAMC's Outlier Case Payment claim in its dismissal order.  Instead, the Board mistakenly stated that the RFBN Adjustment was the only issue in Case No. 12-0521 and dismissed the case.

65.     The Board's disposition of CAMC's first request for good cause extension is the subject of a motion for reconsideration, filed with the Board on October 4, 2013. CAMC has also filed this lawsuit to preserve its right to challenge the Board's final determination in this Court, resulting from the Board's failure to consider the good cause extension request as related to the Outlier Case Payments claim. That decision is based on a misunderstanding of the facts of the case and is, thus, invalid.

66.     The Board offered one reason for denying both CAMC's and Bozeman's requests for good cause extension to file their RFBN Adjustment claim, stating that "[HHS's] errors [in calculating RFBN Adjustment] were known as early as December 22, 2009 when the district court issued its decision in *Cape Cod Hosp. v. Sebelius*. This was before the [Hospitals' respective] Notice of Program Reimbursement and well before they filed their appeal..." The Board, however, apparently overlooked the fact that the district court decided the case in the Secretary's favor and, moreover, the Board had no basis in the record to conclude that the *Cape Cod* district court decision provided the Hospitals with any of the information HHS had concealed, much less any of the information as set forth in the Settlement Agreement.

67.     The Board's dismissal order was also based on a misunderstanding of the facts of the case. The Board mistakenly stated that CAMC's and Bozeman's claims were filed more than three years after the issuance of the NPRs when they were in fact filed within 31 and 15 months, respectively.

68.     The Board also denied CAMC's and Bozeman's requests for equitable tolling. This aspect of the Board's dismissal is not a subject of the present challenge.

69. The Board's decision dismissing the Hospitals' requests for good cause extensions is the final decision of the Secretary, which the Hospitals now timely appeal to this Court, within 60 days of their receipt of the Secretary's final determinations.

## VI. THE BOARD'S DECISIONS DISMISSING THE HOSPITALS' APPEALS BY DENYING THE REQUESTS FOR GOOD CAUSE EXTENSION VIOLATE THE GOOD CAUSE EXTENSION REGULATIONS AND THE APA

70. The Court should hold unlawful and set aside the Board's decisions to dismiss the Hospitals' appeals and to deny their requests for good cause extensions because these decisions were (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (B) without observance of procedure required by law, and/or (C) unsupported by substantial evidence insofar as:

    a.    The Hospitals have satisfied all express requirements of the Good Cause Regulation, and the facts support a finding of good cause;

    b.    HHS erred when it relied on the Post-2008 Good Cause Regulation in denying CAMC's requests for good cause extension to file appeals. CAMC's claims are for reimbursements due on account of patients treated in FYE 2006. Thus, its right to appeal these claims accrued before the 2008 amendments to the PRRB Regulations, and the Original Good Cause regulation applies to CAMC's FYE 2006 motions;

    c.    The Board failed to consider CAMC's validly raised good cause extension to file the Outlier Case Payment claim, and its failure to do so constitutes arbitrary and capricious agency action;

20

      d.      The Board's decisions are not supported by the record facts insofar as;

            i.      The Board's dismissals relied on the mistaken facts that the Hospitals' raised their claims more than three years from the date of the NPRs; and

            ii.      The Board's dismissal of CAMC's appeal relied on the mistaken fact that CAMC had filed only a single request to recognize good cause for an extension of time for filing appeals with the Board, relating to the RFBN Adjustment.

      e.      The Board's stated reason for denying the good cause extensions is arbitrary and capricious because it lacks any record support.

      f.      The Post-2008 Good Cause Regulation, as construed by the Board, is invalid because it conflicts with the law, including the Supreme Court's guidance in *Auburn Regional*.

      g.      The Post-2008 Good Cause Regulation is invalid because it purports to exclude the Board's decision from judicial review, which is beyond HHS's authority.

      h.      The Board's decisions improperly failed to consider the grounds for cause presented in the Hospitals' motions which fit with the grounds for good cause identified in *Auburn Regional*.

      i.      The Post-2008 Good Cause Regulation is invalid because it effectively permits the Secretary to avoid providers' appeals after intentionally concealing key information revealing that she has failed to adhere to the mandates of a statute and/or engaged in arbitrary and capricious decision

making, so long as she does so until after the 180-day appeal period has expired.

## VII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an order:

1.      Invalidating the Secretary's Post-2008 Good Cause Regulation;

2.      Finding that the good cause exists for extensions of the 180-day appeal period for Hospitals' appeals;

3.      Remanding the Hospitals' appeals to the Board for further proceedings consistent with the Court's findings;

4.      Awarding the Hospitals their attorney fees and costs for prosecution of this appeal as permitted under any applicable law; and

5.      Granting the Hospitals such further and additional relief as may be just and warranted.

Respectfully submitted this 4th day of October, 2013.


By:   /s/ Stephen P. Nash
Stephen P. Nash (D.C. Bar #PA0037)

PATTON BOGGS LLP
1801 California, Suite 4900
Denver, CO  80202
Tel.: (303) 830-1776
Fax: (303) 894-6173
E-mail: snash@pattonboggs.com
Counsel for Plaintiffs